# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP2375 |
| COMPLETE TITLE: | Milwaukee Police Association and Michael Crivello, |
| | Plaintiffs-Appellants-Petitioners, |
| | Milwaukee Professional Fire Fighters Association, Local 215 and David R. Seager, Jr., |
| | Intervenors-Plaintiffs-Co-Appellants-Petitioners, |
| | v. |
| | City of Milwaukee, |
| | Defendant-Respondent. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 375 Wis. 2d 326, 897 N.W.2d 67
(2017 – Unpublished)

| | |
|---|---|
| OPINION FILED: | July 6, 2018 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | November 14, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Timothy G. Dugan |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | R.G. BRADLEY, J., concurs, joined by GABLEMAN, J. (opinion filed). |
| DISSENTED: | ABRAHAMSON, J., dissents, joined by A.W. BRADLEY J. (opinion filed). |
| | KELLY, J., dissents (opinion filed). |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiffs-appellants-petitioners, there were briefs filed by *Jonathan Cermele* and *Cermele & Matthews*, *S.C.*, Milwaukee. There was an oral argument by *Jonathan Cermele.*

For the intervenors-plaintiffs-co-appellants-petitioners, there were briefs filed by *Christopher J. MacGillis*, *Sean E. Lees*, and *MacGillis Wiemer*, *LLC*, Wauwatosa. There was an oral argument by *Christopher J. MacGillis.*

For the defendant-respondent, there was a brief filed by *Stuart S. Mukamal*, assistant city attorney; *Grant F. Langley*, city attorney; and *Miriam R. Horwitz*, deputy city attorney. There was an oral argument by *Stuart S. Mukamal.*

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP2375
(L.C. No. 2014CV8688)

STATE OF WISCONSIN        :        IN SUPREME COURT

**Milwaukee Police Association and Michael Crivello,**

      **Plaintiffs-Appellants-Petitioners,**

**Milwaukee Professional Fire Fighters Association, Local 215 and David R. Seager, Jr.,**

      **Intervenors-Plaintiffs-Co-Appellants- Petitioners,**

      **v.**

**City of Milwaukee,**

      **Defendant-Respondent.**

**FILED**

**JUL 6, 2018**

Sheila T. Reiff
Clerk of Supreme Court

---

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 PATIENCE DRAKE ROGGENSACK, C.J. When the Employee Retirement System (ERS) was created for the City of Milwaukee (the City) in 1937, the State granted each employee-member of the ERS the right to vote for the election of three employees to serve on the ERS Annuity and Pension Board (the Board) comprised of seven members. In 1947, the State granted all first class

cities the opportunity to manage the ERS pursuant to the exercise of home rule powers. However, the State also protected individual rights of those persons who were members of an ERS because the State precluded amendment or alteration that modified "the annuities, benefits or other rights of any persons who are members of the system prior to the effective date of such amendment." § 31(1), ch. 441, Laws of 1947.

¶2 In 1967, the City exercised its home rule over the ERS, consistent with the State's protections of individual member rights. However, in 2013, the City amended its charter ordinance and reduced the voting rights of employees. Each employee-member was permitted to vote for only one employee to serve on the Board, rather than three, and employees could no longer vote for the employees of their choice. The City also gave the mayor three appointments, thereby increasing the size of the Board to eleven members.

¶3 Milwaukee Police Association (MPA) members and Milwaukee Professional Fire Fighters Association (MPFFA) members challenged the 2013 amendment, saying that it altered the "other rights" of employee-members of the ERS who were members prior to the amendment in violation of State law.

¶4 Upon review, we conclude that the City's 2013 amendment to its charter ordinance that reduced each individual employee-member's right to vote for three employees of his or her choice to serve on the Board, while diluting employees' voice on the Board, modified "other rights" and therefore, is contrary to State law. Accordingly, for the reasons stated more

2

fully below, we reverse the decision of the court of appeals and restore the right of employee-members to vote for three employees of their choice to serve as employee-members of the Board. We also return the Board's size to its size prior to 2013.

## I. BACKGROUND

¶5 In 1937, the State established the ERS and its administrative powers and responsibilities for cities of the first class. Ch. 396, Laws of 1937. The "administration and responsibility for the proper operation of the retirement system" were "vested" in the Board. Id., § 7(1). The 1937 Law established classifications for Board positions and the right of employees to elect three employees to serve as Board members. Relevant to our discussion of MPA's and MPFFA's challenge, the Law provided:

> (2) MEMBERSHIP. The membership of the board shall consist of the following:
>
> (a) Three members to be appointed by the chairman of the common council or other governing body (subject to the confirmation by such common council or other governing body), for a term of three years,
>
> (b) The city comptroller ex-officio,
>
> (c) Three employe[e] members who shall be members of the retirement system and who shall be elected by the members of the retirement system for a term of three years according to such rules and regulations as the board shall adopt to govern such election. The initial terms of the first three members so elected shall expire at the end of one, two and three years, respectively. Following the completion of the initial terms, the terms of the office of such members shall be three years.

§ 7(2), ch. 396, Laws of 1937.

¶6 If a vacancy occurred "in the office of a board member," the 1937 Law provided that "the vacancy shall be filled for the unexpired term in the same manner as the office was previously filled." Id., § 7(3). Each Board member had one vote. "Four votes shall be necessary for a decision by the members of the board at any meeting of the board." Id., § 7(5).

¶7 The 1937 Law also provided that it is the Board's responsibility to "establish rules and regulations for the administration of the funds created by this act and for the transaction of its business." Id., § 7(6). The Board members were "trustees of the several funds of the system," and given the "full power [and] sole discretion to invest and re-invest." Id., § 9(1).

¶8 In 1947, in order to give all first class cities such as Milwaukee "the largest measure of self-government with respect to pension annuity and retirement systems," the State amended its 1937 ERS enactment and granted the City the opportunity to assume responsibility for the ERS, whereby the City could "amend or alter the provisions" of the ERS "in the manner prescribed by section 66.01 of the statutes." § 31(1), ch. 441, Laws of 1947. However, in so doing, the legislation did not give the City carte blanche to amend the ERS as it pleased. Rather, the law explicitly limited the City's power, providing that "no such amendment or alteration [to the ERS] shall modify the annuities, benefits or other rights of any

4

persons who are members of the system prior to the effective date of such amendment or alteration." Id.

¶9 In 1967, the City, by charter ordinance, exercised home rule over the ERS. The City adopted the language from § 31(1) of the 1947 Law nearly verbatim. The City's home rule as it appears in its charter ordinance states:

> For the purpose of giving to cities of the first class the largest measure of self-government with respect to pension, annuity and retirement systems compatible with the constitution and general law, it is hereby declared to be the legislative policy that all future amendments and alterations to this act are matters of local affair and government and shall not be construed as an enactment of statewide concern. Cities of the first class are hereby empowered to amend or alter the provisions of this act in the manner prescribed by s. 66.0101, Wis. Stats., _provided that no such amendment or alteration shall modify the annuities, benefits or other rights of any persons who are members of the system prior to the effective date of such amendment or alteration_.

Milw., Wis., Charter Ord. § 36-14 (emphasis added). Following the City exercising its home rule power, the voting rights of ERS members who were employees remained the same as that provided by statute when the ERS was created. That is, employees continued to have the right to vote for three employees to serve as members to the Board. Milw., Wis., Charter Ord. § 36-18-2.

¶10 In 1972, the City amended its charter ordinance, changing the composition of the Board. The amendment added a retired employee as a member of the Board, elected by other retired employees. Milw., Wis., Charter Ord. § 36-15-2(d). This change did not limit the voting rights of employee-members,

who continued to have the right to elect three employees of their choice to serve as members of the Board. Id.

¶11 In 2013, the City again amended its charter ordinance. The 2013 amendment significantly reduced the voting rights of employees to select employees as members of the Board. MPA members were limited to electing only one Board member, and that person had to be a police officer. Milw., Wis., Charter Ord. § 36-15-(2)(c). MPFFA employees voting rights were similarly reduced so that they too could elect only one Board member and they could select only a firefighter. Id. And finally, the City limited the voting rights of all other employee-members of the ERS such that they could vote for only one Board member who could be neither a police officer nor a firefighter. Id.

¶12 The 2013 amendment also increased the size of the Board to eleven members. While the chairman of the common council continued to appoint three Board members, pursuant to the amendment, the mayor was given power to appoint three additional Board members. Id., § 36-15-(2)(a-3).

¶13 MPA challenged the 2013 changes to the ERS in circuit court, seeking declaratory judgment and a permanent injunction. In so doing, MPA alleged that the 2013 amendment infringed on the rights of police officers to vote for three employees to serve as ERS Board members, and to participate in a Board of similar size to that provided in the State's 1947 delegation to the City. The circuit court allowed MPFFA, who sought the same relief, to intervene.

¶14 The City and MPA filed cross-motions for summary judgment, and the circuit court ruled in favor of the City, concluding that the modifications of the ERS were lawful.[1] In its oral ruling, the circuit court concluded that "under the circumstances[,] the other rights provisions of the statute and the charter do not include a specific right to the makeup of the board," and "the city's modification of the makeup of the board does not affect any of the rights of the members." The circuit court did not address the curtailment of individual employee's right to vote to elect three employees to serve as Board members.

¶15 On appeal, the court of appeals affirmed the circuit court, relying in large part on Stoker v. Milwaukee Cty., 2014 WI 130, 359 Wis. 2d 347, 857 N.W.2d 102. The court of appeals concluded that there were no vested rights to the size, composition, and manner of election of the Board and that "the City is entitled to amend, on a prospective basis" these matters "because the members of the retirement system do not have any rights in those matters." Milwaukee Police Ass'n, No. 2015AP2375, unpublished slip op., ¶21 (Wis. Ct. App. Mar. 23, 2017). As with the circuit court, the court of appeals ignored individual employee's right to vote to elect three employees to serve as Board members. The court of appeals did so by shifting the focus of its discussion to the Board's "size,

---

[1] The Honorable Timothy G. Dugan of Milwaukee County presided.

7

composition, and manner of elections," rather than considering individual employee's statutory right to vote or whether they had a meaningful voice in Board decisions. Id., ¶17.

¶16 MPA and MPFAA sought review of the court of appeals' decision; we granted review. For the reasons set forth below, we reverse the decision of the court of appeals.

## II. DISCUSSION

### A. Standard of Review

¶17 This case is before us on summary judgment granted to the City. We review summary judgments independently. Grygiel v. Monches Fish & Game Club, Inc., 2010 WI 93, ¶12, 328 Wis. 2d 436, 787 N.W.2d 6. Here, summary judgment turns on statutory interpretation that we also address independently, while benefitting from the discussions of the court of appeals and the circuit court. Voces De La Frontera v. Clarke, 2017 WI 16, ¶12, 373 Wis. 2d 348, 891 N.W.2d 803.

¶18 Furthermore, we independently decide, as a matter of law, whether a matter is primarily of statewide concern, Black v. City of Milwaukee, 2016 WI 47, ¶30, 369 Wis. 2d 272, 882 N.W.2d 333.

### B. Statute/Ordinance Interaction

¶19 Municipal corporations have only those powers that were specifically conferred on them and those that are necessarily implied by the powers conferred. Van Gilder v. City of Madison, 222 Wis. 58, 73, 268 N.W. 108 (1936); Butler v. City of Milwaukee, 15 Wis. 546 (*493), 550 (*497) (1862).

8

¶20 The City, through statutory delegation from the State and its enactment of charter ordinance pursuant to Wis. Stat. § 66.0101 (2015-16),[2] has home rule powers permitted by Article XI, § 3(1) of the Wisconsin Constitution, some of which bear on the ERS.[3] Black, 369 Wis. 2d 272, ¶4.

¶21 In the case before us, the State permitted the City to exercise home rule over many ERS provisions. Ch. 441, Laws of 1947. The City began to exercise those powers in 1967. However, notwithstanding the City's home rule powers, certain aspects of the ERS continued to be matters of statewide concern. See e.g., Madison Teachers, Inc. v. Walker, 2014 WI 99, ¶95, 358 Wis. 2d 1, 851 N.W.2d 337 (concluding that Wis. Stat. § 62.623 (2011-12), which prohibited the City from paying employees' shares of ERS contributions, was a matter of statewide concern and therefore, § 62.623 superseded the City's home rule powers). Furthermore, the delegation of authority to the City in regard to the ERS was specifically limited by the legislature's 1947 enactment. The City was given no power to "modify the annuities, benefits or other rights of persons who are members of the system."

---

[2] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

[3] Cities and villages organized pursuant to state law may determine their local affairs and government, subject to the Wisconsin Constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or village. The method of such determination shall be prescribed by the legislature. Wis. Const. art. XI, § 3(1).

### 1. "Other rights"

¶22 The City's management of the ERS arises through legislative delegation as a "matter[] of local affair[s] and government." § 31(1), ch. 441, Laws of 1947. Through this delegation, the City was given the power to "amend or alter" the ERS to best suit the needs of the system. However, an important limitation was placed on the City; it was precluded from modifying "the annuities, benefits or other rights of any persons who are members of the system . . . ." Id. (emphasis added).

¶23 At oral argument all parties seemed to agree that neither the employees' right to vote for three employees to serve as members of the Board nor the size of the Board comes within "annuities" or "benefits." The City did not contest that employees are "persons who are members of the system."

¶24 Where the disagreement lies is with the meaning of "other rights." That disagreement is two-fold: (a) whether each employee-member has the right to vote to elect three employees to serve as Board members, and (b) whether the Board must remain of a similar size to that originally established under the 1947 Law, wherein the State specifically limited the City's management powers over the ERS. We address each contention in turn.

### a. Employee voting rights

¶25 The ERS was created by the legislature to provide benefits for City employees at their retirement and to pay benefits to the widows and children of deceased employees.

10

Ch. 396, Laws of 1937. The Board was charged with the responsibility to establish rules and regulations for conducting Board business. Id., § 7(6). Board members were "trustees" of the funds they managed, in which the Board had "full power in its sole discretion to invest and re-invest." Id., § 9(1).

¶26 In 1937, each employee who was an ERS member was granted voting rights sufficient to elect three employees of his or her choice to become Board members. Id., § 7(2)(c). Those employee voting rights assured that the interests of employees, for whom the ERS was created, would have a meaningful voice in Board decisions. Stated more fully, employee-elected Board members were positioned to have oversight of the ERS so that its funds would not be wasted and employees left without income after years of work.

¶27 In 1947, when the State granted the City the opportunity to manage the ERS through enactment of a home rule charter ordinance, the State limited the City's ability to amend or alter the ERS. The State specifically protected employees by providing that the City could not "modify the annuities, benefits or other rights of any persons who are members of the system prior to the effective date of such amendment or alteration." § 31(1), ch. 441, Laws of 1947 (emphasis added).

¶28 "Other rights" is not a legislatively defined term. Accordingly, we interpret "other rights" to give meaning to the legislative mandate by which the State limited the City's power to amend or alter the ERS. State ex rel Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110.

11

¶29 The purpose of a statute informs our interpretation of statutory terms. McNeil v. Hansen, 2007 WI 56, ¶16, 300 Wis. 2d 358, 731 N.W.2d 273 (citing Klein v. Bd. of Regents of Univ. Wis. Sys., 2003 WI App 118, ¶13, 265 Wis. 2d 543, 666 N.W.2d 67 (concluding that statutory interpretation that contravenes the purpose of a statute is disfavored)). If a statute is capable of a reasonable construction that carries out the manifest purpose of the enactment, that construction should be given. Westmas v. Creekside Tree Serv., Inc., 2018 WI 12, ¶19, 379 Wis. 2d 471, 907 N.W.2d 68. Statutory terms are interpreted in the context in which they occur, not in isolation. State ex rel Kalal, 271 Wis. 2d 633, ¶46. Ejusdem generis[4] is a canon of statutory construction that is sometimes employed to arrive at the meaning of a term from the context in which the term appears. Milwaukee Journal Sentinel v. DOA, 2009 WI 79, ¶44, 319 Wis. 2d 439, 768 N.W.2d 700.

¶30 That annuities and benefits are rights of employees, is not contested by the City. Furthermore, a plain reading of the statute where annuities and benefits precede "other rights" in the same sentence implies that "other rights" are of the same type, i.e., ERS rights belonging to employees, Auto-Owners Ins.

---

[4] Ejusdem generis is "A canon of construction holding that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed." Ejusdem Generis, Black's Law Dictionary 631 (10th ed. 2014). It literally means "of the same kind." Auto-Owners Ins. Co. v. City of Appleton, 2017 WI App 62, ¶17, 378 Wis. 2d 155, 902 N.W.2d 532.

12

Co. v. City of Appleton, 2017 WI App 62, ¶17, 378 Wis. 2d 155, 902 N.W.2d 532, as contrasted with ERS rights belonging to the City.

¶31 "Annuity" is a defined term that focuses on financial payments for the welfare of ERS members and their families. § 1(6), ch. 396, Laws of 1937. However, although ch. 441, Laws of 1947 did not define "other rights," the 1947 legislation did explain that the "purpose of safeguarding the stability of pension systems" was an important concern. § 31(2), ch. 441, Laws of 1947. Safeguarding ERS stability is promoted by employee-participation in the Board because it is employees, current and past, for whom stability of the ERS is critical. Preamble to ch. 396, Laws of 1937.

¶32 With that clearly stated purpose in mind, the phrase, "other rights" easily encompasses employee voting rights because employee members of the Board are in a unique position to oversee the Board's use of funds and thereby safeguard the financial stability of the ERS. Employees have the most to gain from a financially stable ERS because the ERS directly impacts their financial security upon retirement. In addition, it is employees who will suffer most if ERS funds are lent to a cause that returns a worthless promissory note in exchange for the funds that the Board manages, as has occurred in other states.[5]

---

[5] See Illinois Pension Problem: Coming to a State Near You, USA Today, July 12, 2017; Rachel Greszler, How Big Is Your State's Share of $6 Trillion in Unfunded Pension Liabilities?, The Daily Signal, Dec. 20, 2017.

13

¶33 And finally, the term, "other rights," occurs in a series of financially related terms, e.g., annuities and benefits that affect employees. It is reasonable to conclude that § 31(1) of the 1947 enactment meant the phrase "or other rights" to include employee ERS rights bearing on financial matters in addition to annuities and benefits. This context assists in interpreting the meaning of "other rights." Milwaukee Journal Sentinel, 319 Wis. 2d 439, ¶44.

¶34 We conclude that the term, "other rights," includes the right of each individual employee-member of the ERS to vote for three employees of his or her choice to become members of the Board and thereby oversee the continued financial stability of the ERS. Stated otherwise, it was these other financially-related rights of individual employee-members that the State required the City not amend or alter. As we have explained above, the right of each employee to vote to elect three employee members to serve on the ERS Board promotes financial stability for the ERS.

b. Board size

¶35 When the Board was established in 1937, it had seven members, three of whom were current City employees, three of whom were political appointees. § 7(2), ch. 396, Laws of 1937. Each Board member had one vote, and a Board decision required four votes. Id., § 7(5). The Board size remained the same in 1947 when the State granted the City the opportunity to assume responsibility for the ERS and in 1967 when the City enacted its charter ordinance, availing itself of that opportunity.

14

¶36 In 1972, the City amended its charter ordinance to increase the Board's size to eight. Milw., Wis., Charter Ord. § 36-15-2(d). A Board position for a retired employee, who was elected by retired employees, was added. Id. This decision did not dilute the employees' opportunity to oversee financial decisions of the Board. Financial stability of the Board was paramount for retired employees too.

¶37 In 2013, the City gave the mayor the power to appoint three Board members, thereby increasing the Board size to eleven. Milw., Wis., Charter Ord. § 36-15-2(a-3). Thereafter, six of the eleven Board members were political appointees. This increase in board size with political appointees diluted the employees' ability to have the Board address concerns they may have about ERS's financial stability.

¶38 In the matter before us, the Board was given the administrative responsibility for the operation of the ERS. § 7(6), ch. 396, Laws of 1937. For example, the Board was given the responsibility to "establish rules and regulations for the administration of the funds." Id. Board members were denominated, "trustees," of the assets under their care. Id., 9(1). Although this change in the size of the Board did not affect the Board's purpose or its obligations, it did affect the employees' voice in regard to Board decisions. With three appointments made by the chairman of the common council and three appointments made by the mayor, political appointees could control all Board decisions, including those affecting the financial stability of ERS.

¶39 We conclude that having a meaningful voice on the Board is among the "other rights" of employees that the City was not free to alter or modify under its home rule authority. Accordingly, we reverse the court of appeals conclusion that increasing the size of the Board to eleven members did not conflict with State law.

## 2. Statewide concern

¶40 We next consider whether promoting financial stability of the ERS is a matter primarily of statewide concern, primarily of local concern or a combination of the two. Madison Teachers, 358 Wis. 2d 1, ¶96. When there is a conflict between a home rule ordinance and countervailing state legislation, if the matter is exclusively of statewide concern, the statute controls. Id., ¶116; see also DeRosso Landfill Co. v. City of Oak Creek, 200 Wis. 2d 642, 647, 547 N.W.2d 770 (1996).

¶41 Furthermore, when a law concerns a policy matter primarily of statewide concern, home rule powers are insufficient to permit municipal regulation of the matter. Madison Teachers, 358 Wis. 2d 1, ¶97 (citing Van Gilder, 222 Wis. at 84.) If a matter is primarily of local concern, the State nevertheless may regulate the matter so long as the State does so with uniformity. Id., ¶99.

¶42 It is within the purview of the legislature to enact statutes that regulate for the benefit of public health, safety and welfare. Black, 369 Wis. 2d 272, ¶5. Stability of the ERS was a concern of the legislature in 1947 when it created the opportunity for home rule management. § 31(2), ch. 441, Laws of

16

1947. The financial stability of the ERS affects the welfare of present and past ERS members and their families.

¶43 Legislative protection of retirement benefits for employees, as well as for widows and children of deceased employees, is a matter of public welfare, and therefore, primarily of statewide concern. Madison Teachers, 358 Wis. 2d 1, ¶97. A financially stable ERS is promoted by the legislature's grant of the right to each employee-member to elect three employees to serve on the Board where their number gives a meaningful voice to employees' concern for financial stability of the ERS. Stated otherwise, through their right to vote to elect employees who will have Board participation with a meaningful voice, employees can assure that present and future financial stability of the ERS remain paramount. Accordingly, the voting rights of individual employees for membership on a Board that does not unduly dilute their participation supports and is intertwined with a matter of statewide concern.

### III. CONCLUSION

¶44 We conclude that the City's 2013 amendment to its charter ordinance that reduced each individual employee-member's right to vote for three employees of his or her choice to serve on the Board while diluting employees' voice on the Board modified "other rights" and therefore is contrary to State law. Accordingly, we reverse the decision of the court of appeals in this regard and restore the right of employee-members to vote for three employees of their choice to serve as employee-members

17

of the Board.  We also return the Board's size to its size prior to 2013.

*By the Court.*—The decision of the court of appeals is reversed.

¶45 REBECCA GRASSL BRADLEY, J. *(concurring).* I join the majority opinion but write separately to respond to the dissents. One dissent accuses the majority of having "manufactured" a right for the employee members of the Employee Retirement System of Milwaukee because the statutes do not define what "other rights" the Wisconsin legislature prohibits the City from modifying. Justice Kelly's dissent, ¶103. But when the legislature does not define a term, it is up to the judiciary to identify and declare its meaning, something neither dissent attempts. Another dissent says the majority's recognition of employee voting rights "borders on the absurd." Justice Abrahamson's dissent, ¶55. However, the logical extension of the dissents' position would be to allow the City to disband the Employee Retirement System (ERS) Annuity and Pension Board (Board) altogether, thereby eliminating the entire administrative structure of the ERS.[1]

¶46 The legislature "vested" "[t]he general administration and responsibility for the proper operation of the retirement system . . . in an annuity and pension board." § 7(1), ch. 396, Laws of 1937. The legislature also "vested" in the Board the responsibility "for making effective the provisions of this

---

[1] The City, in fact, contends it has the right to completely eliminate the Board. Justice Kelly's dissent mischaracterizes my application of the Presumption Against Ineffectiveness principle (see Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012)) and infra, ¶¶2, 3, 5, as a "fear that the City will act recklessly." Justice Kelly's dissent, ¶119. My judgments are based on the law, not on emotion or value judgments about parties' actions, and Justice Kelly's dissent is unable to identify any language in my concurrence to the contrary.

act." Id. Accepting the dissents' construction of these laws would render both provisions utterly ineffective: A retirement system would exist for the payment of benefits to employees but there would be no entity to administer or operate it. No entity would exist to "mak[e] effective the provisions" of the law.

¶47 "[T]he purpose of statutory interpretation is to determine what the statute means so that it may be given its full, proper, and intended effect." State ex rel. Kalal v. Circuit Court for Dane County, 2004 WI 58, ¶44, 271 Wis. 2d 633, 681 N.W.2d 110. "A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 63 (2012). "This canon follows inevitably from the facts that (1) interpretation always depends on context, (2) context always includes evident purpose, and (3) evident purpose always includes effectiveness." Id. "[W]e read the language of a specific statutory section in the context of the entire statute. Thus, we interpret a statute in light of its textually manifest scope, context, and purpose." Bosco v. LIRC, 2004 WI 77, ¶23, 272 Wis. 2d 586, 681 N.W.2d 157 (citing Kalal, 271 Wis. 2d 633, ¶¶6, 48 n.8).

¶48 In this case, we interpret the word "rights" in the context of the session laws, which gave the City "the largest measure of self-government with respect to" the ERS, including the right to amend and alter their provisions, except that the City is prohibited from modifying "annuities, benefits or other rights" of ERS members. Because the non-technical word "rights" is not defined in the session laws, we ascertain and apply its

2

ordinary meaning. Town of Lafayette v. City of Chippewa Falls, 70 Wis. 2d 610, 619, 235 N.W.2d 435 (1975). A dictionary definition may guide our interpretation of a non-technical word the session laws do not define. Spiegelberg v. State, 2006 WI 75, ¶19, 291 Wis. 2d 601, 717 N.W.2d 641. "It has come to be well understood that there is no more ambiguous word in legal and juristic literature than the word 'right.'" Roscoe Pound, The Ideal Element in Law 110 (Stephen Presser ed., Liberty Fund 2002) (1958). Black's Law Dictionary includes among its definitions of "right" the following: "Something that is due to a person by just claim, legal guarantee, or moral principle" and "[a] power, privilege, or immunity secured to a person by law." Right, Black's Law Dictionary (10th ed. 2014). Under the 1937 law, Board membership "shall consist of the following:" three members appointed by the chairman of the common council, the city comptroller, and three members appointed by ERS members. § 7(2), ch. 396, Laws of 1937. In the context of the session laws we construe, the mandatory structure of the Board constitutes a statutory right——something due to city employees under the law. One dissent concludes that after the 2013 Amendment, the employees still have three representatives on the Board, so there is no violation. Justice Kelly's dissent, ¶¶109-10. But this conclusion fails to give effect to the textual requirement of membership consisting of seven members—— no more and no less. Because the 2013 Amendment adds three

3

members appointed by the mayor, it violated the session law's mandate.[2]

¶49 The dissents eschew the court's interpretation of "rights" under the session laws but both dissenters decline to interpret the word or give it any meaning whatsoever. "It is, of course, a solemn obligation of the judiciary to faithfully give effect to the laws enacted by the legislature, and to do so requires a determination of statutory meaning." Kalal, 271 Wis. 2d 633, ¶44 (emphasis added). In accordance with this judicial duty, the court applies an interpretation that furthers the purpose of the session laws——ensuring the security of retirement and death benefits——by preserving the legislature's mandate of a Board to administer and operate the ERS. The dissents' interpretation would obstruct this express legislative purpose by allowing the elimination of the Board, leaving the ERS without any entity to administer or operate it. "An interpretation that contravenes the manifest purpose" of a law "is unreasonable." State v. Dinkins, 2012 WI 24, ¶29, 339 Wis. 2d 78, 810 N.W.2d 787.

---

[2] Justice Abrahamson's dissent questions whether the court's decision in this case means that the 1972 amendment, which added the retiree position to the Board (thereby expanding its membership to eight), is also invalid. Justice Abrahamson's dissent, ¶99. That issue is not before us, no one apparently contested the 1972 amendment, and our decision in this case has no impact on that amendment. Justice Kelly's dissent misunderstands this statement as a validation of the 1972 amendment adding a retiree member to the Board. Justice Kelly's dissent, ¶¶125-26. Again, the court does not decide whether the 1972 amendment conforms with the Session Laws; no party presented that issue to us.

¶50 The dissents maintain that the statutorily-prescribed Board composition is not a right of ERS members without any attempt to give meaning to this pivotal word. But "[w]ithout some indication to the contrary, general words . . . are to be accorded their full and fair scope. They are not to be arbitrarily limited." Scalia & Garner, supra ¶3, at 101. The dissents apparently "think that when courts confront generally worded provisions, they should infer exceptions for situations that the drafters never contemplated and did not intend their general language to resolve." Id. But "[t]raditional principles of interpretation reject this distinction because the presumed point of using general words is to produce general coverage——not to leave room for courts to recognize ad hoc exceptions." Id. Our interpretive task is, of course, easier when the legislature uses specific or defined terms, but when the legislature speaks broadly using general terms, "they must be given general effect." Id.

¶51 While the state legislature precluded the City from changing the composition of the Board, the legislature itself retains this power.[3] The ERS, as well as the Board, are

---

[3] Justice Kelly's dissent classifies my analysis as a "petitio principii error." Justice Kelly's dissent, ¶129. In plainer terms, he means it begs the question. This argument distorts my analysis of the "other rights" clause. I agree with Justice Kelly that this clause "is not a source of rights, it only protects rights that already exist elsewhere." Id. Justice Kelly and I simply disagree as to whether Board composition is a right. Justice Kelly also misrepresents my analysis by claiming that I "acknowledge the legislature can change the Board's composition without impacting any of the ERS members' rights." Id., ¶28. This concurrence says no such thing. While Board composition is a right, it is statutory, not
(continued)

5

statutory creations. Accordingly, they remain within the authority of the legislature to alter. And while the state legislature delegated a broad measure of self-governance to the City with respect to the ERS, the people's elected representatives exempted from that transfer of authority any changes to city employees' benefits, annuities, and other rights. What the legislature gives, it may take away——excluding any vested benefits. Stoker v. Milwaukee Cty., 2014 WI 130, ¶24, 359 Wis. 2d 347, 857 N.W.2d 102 ("[A] right that is unvested, by definition, can be taken away.").

¶52 One dissent accuses the court of "roam[ing] the state looking for good ideas to enact" and legislating instead of adjudicating. Justice Kelly's dissent, ¶¶103, 115. Whether a smaller Board is a better idea than a larger Board is irrelevant to me. Discerning the meaning of a law is the essence of the judicial function. It requires the application of canons of interpretation, which serve as "guides to solving the puzzle of textual meaning, and as in any good mystery, different clues often point in different directions." Scalia & Garner, supra

---

constitutional. Accordingly, the legislature may change it, and that would certainly impact members' rights. Because Board composition is an "other right" the City may not modify it; the legislature withheld this power from the City in its otherwise broad delegation of authority to the City. This is not "illogic"; it is fundamental law. See Relyea v. Tomahawk Paper & Pulp Co., 102 Wis. 301, 304, 78 N.W. 412 (1899) ("[M]ere statutory rights may be conferred upon such conditions as in the wisdom of the legislature may seem best, and the conditions may be changed from time to time, even as to existing rights, or such rights may be taken away entirely, at the legislative will.").

¶3, at 59. While the principles of statutory interpretation are stable, it is not "always clear what results the principles produce." Id. at 61. Reaching a different result does not equate to legislating. Judges "may arrive at differing reasonable readings because the legislature used imprecise terms." Daniel R. Suhr, Interpreting Wisconsin Statutes, 100 Marq. L. Rev. 969, 985 (citing Landis v. Physicians Ins. Co. of Wis., 2001 WI 86, ¶26, 245 Wis. 2d 1, 628 N.W.2d 893).[4] Statutory "provisions are neither to be restricted into insignificance, nor extended to objects not comprehended in them." Ogden v. Saunders, 25 U.S. (12 Wheat.) 213, 332 (1827). The dissents' interpretation would render insignificant, if not altogether eliminate, the word "rights" from the text of the session laws. I reject such a "'viperine' construction that kills the text." Scalia & Garner, supra ¶3, at 40. I therefore join the court in upholding the statutory right of City

---

[4] Apparently because the legislature did not define the word "right" to encompass Board composition, Justice Kelly's dissent would remove Board composition from its scope. Justice Kelly's dissent, ¶124. Of course, the legislature did not define "right" at all. As this concurrence explains, the legislature's linguistic imprecision does not relieve us of our obligation to interpret the language the legislature did use. I agree that "[o]ur job in this case was not to delve into the [Session Laws] to discover all of the other rights they might confer on the ERS members . . . ." Justice Kelly's dissent, ¶127. Our responsibility was to interpret the word "rights" and determine whether Board composition is among them. The dissents do not interpret the word but merely disagree with the majority's analysis of it.

employees to the legislatively-mandated[5] composition of the ERS Board.[6]

¶53 I am authorized to state that Justice MICHAEL J. GABLEMAN joins this concurrence.

---

[5] Justice Kelly's dissent misrepresents the scope of my analysis. Justice Kelly's dissent, ¶123. It is not the fact that the Session Laws mandate the composition of the Board that removes the Board structure from the otherwise broad grant of authority of the City. That mandate, like any other in the Session Laws, must be read in conjunction with the pivotal language that constrains the City's ability to modify the provisions governing the ERS under the "other rights" clause. Not every "legislative specification" constitutes a "right" of ERS members that the City may not disturb.

[6] Justice Kelly's dissent criticizes my opinion for being "short——to the point of nonexistence——on sources of law for its conclusion." Justice Kelly's dissent, ¶119. We both analyze the Session Laws, although we reach differing interpretations. I rely on nine cases and four secondary sources, including Black's Law Dictionary and Justice Antonin Scalia's renowned treatise on textual interpretation, to support my eight-page opinion. Justice Kelly cites two cases in his sixteen-page opinion, and no precedent or authorities whatsoever in the seven pages he devotes to attacking my concurrence.

¶54  SHIRLEY S. ABRAHAMSON, J.  *(dissenting).* The statute delegating authority to first class cities to administer their own retirement systems explicitly states that the statute's purpose is to allow all first class cities "the largest measure of self-government with respect to pension annuity and retirement systems[.]"  § 31, ch. 441, Laws of 1947.  How can this statutory statement of purpose be squared with the majority's interpretation of the 1947 Law?  It can't.

¶55  The idea espoused by the majority that the legislature intended to afford cities "the largest measure of self-government with respect to pension annuity and retirement systems" but did not intend to allow cities to change the composition of their municipal pension boards (essentially the governing bodies of their municipal retirement systems) borders on the absurd.

¶56  In contrast to the majority, I would affirm the court of appeals.  I conclude that the size, composition, or manner of election of the Pension Board set forth in the 1947 Law and section 36-14 of the City Charter may be amended, altered, or modified.  Members of the Retirement System have the right to have their benefit commitments fulfilled, but they do not have a right to determine exactly how those benefit commitments are fulfilled.  Thus, I conclude that the 2013 Milwaukee Charter Amendment did not violate the 1947 Law or Section 36-14 of the City Charter by modifying the "annuities, benefits or other rights" of any persons who were members of the Retirement System prior to the effective date of the Amendment.

¶57 Rather than provide a detailed critique of the majority opinion, I set forth below the opinion I think should have been written by the court.

* * * *

¶58 This is a review of an unpublished per curiam decision of the court of appeals affirming a judgment of the Circuit Court for Milwaukee County, Timothy G. Dugan, Judge.[1] The circuit court granted the motion of the City of Milwaukee, the defendant, for summary judgment and denied the cross-motion for summary judgment[2] of one of the plaintiffs, the Milwaukee Police Association.[3] The circuit court entered judgment in favor of the City dismissing the Unions' complaints. The Unions appealed.

¶59 On the Unions' appeal, the court of appeals affirmed the circuit court judgment in favor of the City. The court of appeals concluded that the City did not violate the rights of members of the City of Milwaukee Employes' Retirement System when it amended section 36-15-2 of the City Charter to change

---

[1] Milwaukee Police Ass'n v. City of Milwaukee, No. 2015AP2375, unpublished slip op. (Wis. Ct. App. Mar. 23, 2017).

[2] For a discussion of cross-motions for summary judgment, see Ziegler Co., Inc. v. Rexnord, Inc., 139 Wis. 2d 593, 595 n.1, 407 N.W.2d 873 (1987).

[3] The plaintiffs are the Milwaukee Police Association and its president, Michael Crivello (together referred to as "the Milwaukee Police Association"), and the Milwaukee Professional Fire Fighters Association, Local 215 and its president, David R. Seager, Jr. (together referred to as "Local 215"). All four plaintiffs will collectively be referred to as "the Unions."

2

the size, composition, and manner of election of the Annuity and Pension Board ("the Pension Board") of the Retirement System.[4]

¶60 The instant case presents a single issue: whether the City's enactment of Common Council File No. 131162 ("the 2013 Milwaukee Charter Amendment") amending section 36-15-2 of the City Charter to alter the size, composition, and manner of election of the Pension Board amends, alters, or modifies the "annuities, benefits or other rights of any persons who are

_____

[4] This opinion sometimes uses the word "employe" rather than "employee." The court of appeals in Richland School District v. Department of Industry, Labor & Human Relations, Equal Rights Division, 166 Wis. 2d 262, 271 n.1, 479 N.W.2d 579 (Ct. App. 1991), explained why "employe" is sometimes used in opinions instead of the significantly more common "employee" as follows:

In a letter to the author, Professor Walter B. Raushenbush of the University of Wisconsin Law School explains why chapters 101 through 108, Stats., refer to "employe" when many well-meaning lawyers and judges refer to "employee":

My father, Paul A. Raushenbush, drafted most of the original legislation [for ch. 108] in 1930-31, and most of the amendments through the mid-1960's. He was director of Wisconsin's Unemployment Compensation Department (under the then Industrial Commission) from roughly 1934 to 1967. I well remember being aware that he strongly favored the spelling with "e"——"employe." And I recall asking him why, when "employee" was surely the more common spelling. His answer was that the statutes must avoid confusion between worker and employer. Since "e" and "r" are right next to each other on the typewriter keyboard, there's a real risk that "employer" might be typed "employee," and vice-versa. The confusion which this might cause could best be avoided, he said, by using "employe."

members of the system prior to the effective date of such amendment or alteration."[5]

¶61 The size, composition and manner of election of the Pension Board were first detailed by the state legislature in 1937. See § 7, ch. 397, Laws of 1937. In 1947, the state legislature granted all first class cities, including the City of Milwaukee, the authority to amend the 1937 Law as applied to their retirement systems, except that "no such amendment or alteration shall modify the annuities, benefits or other rights

---

[5] The Milwaukee Police Association sets forth four issues in its petition for review:

1. Whether a Municipality May Lawfully Disregard Specific Requirements the Legislature Has Placed on the Municipality, by Simply Passing an Ordinance at Odds with the Law?

2. Whether Home Rule Allows the City to Avoid the Mandates Identified by the Legislature in the Session Laws of 1937 and 1947?

3. Whether the Session Laws of 1937 and 1947 Vested ERS Members with the Right to Vote for and Seat ERS Board Members?

4. Whether the Decision below Is in Conflict with the Decisions of this Court in Van Gilder v. City of Madison and Johnston v. City of Sheboygan?

The Milwaukee Professional Fire Fighters Association, Local 215, sets forth a single issue in its petition for review:

1. Whether a Municipality May Ignore the Legislature's Specific Mandates Regarding the Size and Composition of the Pension Board Simply by Passing its Own Ordinance?

The single issue I present in effect addresses the issues set forth in both petitions for review and is dispositive.

4

of any persons who are members of the system prior to the effective date of such amendment or alteration." See § 31, ch. 441, Laws of 1947 (emphasis added).

¶62 I conclude that the 2013 Milwaukee Charter Amendment altering the size, composition, and manner of election of the Pension Board is valid. Neither the size, composition, nor manner of election of the Pension Board is an annuity, benefit, or other right of the members of the Retirement System. Thus, the 2013 Milwaukee Charter Amendment does not modify "annuities, benefits or other rights" of any persons who are members of the Retirement System prior to the effective date of the amendment, alteration, or modification.

¶63 Accordingly, I would affirm the decision of the court of appeals.

I

¶64 The facts are brief and undisputed. In 2013, the City of Milwaukee amended section 36-15-2 of the Milwaukee City Charter. This 2013 Milwaukee Charter Amendment provision sets forth the membership of the Pension Board; it changed the size and composition of the Pension Board and the manner in which Pension Board members were elected.

¶65 Prior to 2013, the Pension Board, which had been changed from its original size and composition by a 1972 amendment to the City Charter, was made up of eight members: three actively employed city employees elected to the Pension Board by actively employed city employees; one retiree elected

by retirees; three appointed by the President of the Common Council; and the City's elected Comptroller, ex officio.

¶66 The 2013 Milwaukee Charter Amendment added three mayoral appointments to the Pension Board for a total of eleven members. The 2013 Milwaukee Charter Amendment also dictated that of the three actively employed city employees on the Pension Board, one must be an active employee of the police department, one must be an active employee of the fire department, and the remaining member must be an active employee of a non-public safety department. Only active police officers may vote to elect the required Pension Board member from the police department. Only active fire fighters may vote to elect the required Pension Board member from the fire department. Finally, only active general (i.e., non-public safety) city employees may vote to elect the required Pension Board member from a non-public safety department.

¶67 The Milwaukee Police Association commenced the instant lawsuit, seeking a declaratory judgment that the 2013 Milwaukee Charter Amendment violated the Retirement System members' vested rights in the size and composition of the Pension Board and the Retirement System members' vested right to elect members to the Pension Board without being limited to voting only for members in their same employment classification.[6] Local 215 of the Milwaukee Professional Fire Fighters Association was allowed to

---

[6] The Unions sometimes refer to their purported right as the right to proportional representation on the Pension Board.

intervene, and its position is essentially the same as that of the Milwaukee Police Association.

¶68 The circuit court granted summary judgment in favor of the City and denied the Milwaukee Police Association's cross-motion for summary judgment. The circuit court concluded that the members of the Retirement System did not have "a specific right to the makeup of the [Pension Board]" and that the 2013 Milwaukee Charter Amendment modifying "the makeup of the [Pension Board] does not affect any of the rights of the members . . . ." The circuit court entered judgment in favor of the City. The Unions appealed to the court of appeals.

¶69 The court of appeals affirmed the judgment of the circuit court. It "conclude[d] that the City is entitled to amend, on a prospective basis, matters related to the size, composition, and manner of election of the pension board[] because the members of the retirement system do not have any rights in those matters."[7]

¶70 The court granted the Unions' petition to review the decision of the court of appeals. For the reasons set forth, I would affirm the decision of the court of appeals.

II

¶71 The court is asked to determine the meaning and validity of the 2013 Milwaukee Charter Amendment. These are questions of law that this court decides independently of the

---

[7] _Milwaukee Police Ass'n v. City of Milwaukee_, No. 2015AP2375, unpublished slip op., ¶42 (Wis. Ct. App. Mar. 23, 2017).

7

circuit court and court of appeals, benefiting from the analyses of the latter two courts.  <u>Megal Dev. Corp. v. Shadof</u>, 2005 WI 151, ¶8, 286 Wis. 2d 105, 705 N.W.2d 645.

III

¶72  To respond to the questions of law presented, I begin by examining the relevant 1937 and 1947 Laws the legislature enacted and the City's history of amending its Charter regarding the composition and election of members of the Pension Board.

¶73  In 1937, the legislature created the Pension Board and granted it administrative authority over the operation of the Retirement System.[8]  The 1937 Law detailed the membership of the Pension Board as follows:

> (2) MEMBERSHIP.  The membership of the board shall consist of the following:
>
> (a) Three members to be appointed by the chairman of the common council or other governing body (subject to the confirmation by such common council or other governing body), for a term of three years,
>
> (b) The city comptroller ex-officio,
>
> (c) Three employe members who shall be members of the retirement system and who shall be elected by the members of the retirement system for a term of three years according to such rules and regulations as the board shall adopt to govern such election.  The initial terms of the first three members so elected shall expire at the end of one, two and three years,

---

[8] § 7, ch. 396, Laws of 1937.  Section 7(1) states:  "The general administration and responsibility for the proper operation of the retirement system and for making effective the provisions of this act are hereby vested in an annuity and pension board which shall be organized immediately after the first four members provided for in this section have qualified and taken the oath of office."  § 7(1), ch. 396, Laws of 1937.

respectively. Following the completion of the initial terms, the terms of the office of such members shall be three years.

§ 7(2), ch. 396, Laws of 1937.

¶74 To allow cities "the largest measure of self-government with respect to pension annuity and retirement systems," in 1947, the legislature empowered "cities of the first class," including the City of Milwaukee, as follows:

> to amend or alter the provisions of [the 1937 Law] in the manner prescribed by section 66.01 of the statutes; provided that no such amendment or alteration shall modify the annuities, benefits or other rights of any persons who are members of the system prior to the effective date of such amendment or alteration.[9]

¶75 The 1947 Law explicitly granted employees "a vested right" to the "annuities and other benefits" offered by the Retirement System and declared that these rights "shall not be diminished or impaired by subsequent legislation or by any other means without [members'] consent." See § 30(2)(a), ch. 441, Laws of 1947.

¶76 The City codified the pertinent part of the 1947 Law in section 36-14 of its Charter as follows:

> **36-14. Home Rule.** For the purposes of giving to cities of the first class the largest measure of self-government with respect to pension, annuity and retirement systems compatible with the constitution and general law, it is hereby declared to be the legislative policy that all future amendments and alterations to this act are matters of local affair and government and shall not be construed as an enactment of statewide concern. Cities of the first class are hereby empowered to amend or alter the

---

[9] § 31, ch. 441, Laws of 1947 (emphasis added).

9

> provisions of this act in the manner prescribed by s. 66.0101, Wis. Stats., provided that no such amendment or alteration shall modify the annuities, benefits or other rights of any persons who are members of the system prior to the effective date of such amendment or alteration.

Milwaukee Charter § 36-14 (emphasis added).

¶77 Since the enactment of the 1947 Law and the codification of pertinent parts in section 36-14 of the City Charter, the City has amended the size, composition, and manner of election of the members of the Pension Board. For example, in 1967, the City Charter was amended to delete obsolete provisions and to revise language pertaining to elected active-employee members of the Pension Board who reach compulsory retirement age during their respective terms. In 1972, a new position on the Pension Board was created to be filled by a retired city employee elected by other retired city employees. In 1980, the term of Pension Board members was extended from three to four years except for the City Comptroller, whose term remained ex officio. In 1996, the term of the three Pension Board members appointed by the President of the Common Council was reduced from four to two years.

¶78 The instant case centers around the 2013 Milwaukee Charter Amendment altering the size, composition, and manner of election of the members of the Pension Board. The 2013 Milwaukee Charter Amendment added three mayoral appointments to the Pension Board for a total of eleven members. It also directed that of the three actively employed city employees on the Pension Board, one must be an active employee of the police department, one must be an active employee of the fire

10

department, and the remaining member must be an active employee of a non-public safety department. Only active police officers may vote to elect the required Pension Board member from the police department. Only active fire fighters may vote to elect the required Pension Board member from the fire department. Finally, only active general (i.e., non-public safety) city employees may vote to elect the required Pension Board member from a non-public safety department.

IV

¶79 This court must determine whether the 2013 Milwaukee Charter Amendment altering the size, composition, and manner of election of the members of the Pension Board violates the 1947 Law and section 36-14 of the City Charter.

¶80 I begin with the texts of the 1947 Law and section 36-14 of the City Charter. The 1947 Law and section 36-14 of the City Charter discussed above contain identical language. They both acknowledge a grant of authority to first class cities to amend, alter, or modify the City Charter, with one exception: "[N]o such amendment or alteration shall modify the <u>annuities, benefits or other rights</u> of any persons who are members of the system prior to the effective date of such amendment or alteration."[10]

¶81 Everyone seems to agree that voting for election of members of the Pension Board does not fall within "annuities or benefits" under the 1947 Law. The questions presented are

---

[10] § 31, ch. 441, Laws of 1947; Milwaukee City Charter § 36-14 (emphasis added).

11

whether voting for election of members of the Pension Board and retaining a Pension Board of a particular size and composition fall within the phrase "other rights" in the 1947 Law.

¶82 The Unions argue that one of their "other rights" protected from amendment or alteration under the 1947 Law and section 36-14 of the City Charter is the right to a Pension Board that is of a particular size and composition and whose members are voted for in a particular manner.

¶83 Resolving the meaning of the legislative phrase "other rights" may be aided by applying the ejusdem generis canon of statutory interpretation. This canon of interpretation "uses context to elicit meaning from statutory language" and provides that "when general words follow specific words in the statutory text, the general words should be construed in light of the specific words listed." Milwaukee Journal Sentinel v. DOA, 2009 WI 79, ¶44, 319 Wis. 2d 439, 768 N.W.2d 700 (quoting State v. Quintana, 2008 WI 33, ¶27, 308 Wis. 2d 615, 748 N.W.2d 447).

¶84 The specific words "annuities" and "benefits" may thus guide the meaning of the phrase "other rights." Adhering to the canon of ejusdem generis and construing general words in light of the specific words in the same list, I conclude that the general words "other rights" in the 1947 Law and section 36-14 of the City Charter refer, as do the words "annuities" and "benefits," to members' financial or monetary advantages or services rendered to members. Accordingly, under the language of the 1947 Law and section 36-14 of the City Charter, first class cities are authorized to amend the 1937 Law, but no such

amendments may alter any members' annuities, benefits, or members' rights to financial or monetary advantages or services to which they have become entitled prior to the effective date of the amendment.

¶85 The Unions' claimed right to a Pension Board of a particular size, composition, and manner of election is inconsistent with my interpretation of "other rights" under the 1947 Law and section 36-14 of the City Charter.[11] The Unions' claimed right is unlike an annuity or a retirement benefit, which contemplate the payment of money or delivery of a service to a beneficiary.

¶86 My conclusion that the Unions do not have a right to a Pension Board of a particular size, composition, and manner of election is supported by the case law.

¶87 In _Wisconsin Professional Police Ass'n, Inc. v. Lightbourn_, 2001 WI 59, 243 Wis. 2d 512, 627 N.W.2d 807, the plaintiffs challenged the constitutionality of a statute making numerous changes to the Wisconsin state retirement system. The statute's changes were "relat[ed] to:  benefit improvements,

---

[11] The Unions also argue that their right in the size, composition, and manner of election of the Pension Board is established in their collective bargaining agreements. The collective bargaining agreements state:  "The City agrees not to diminish any contractual pension and annuity rights presently vested in any employee including any rights enumerated herein." I reject the Unions' interpretation of their collective bargaining agreements for the same reason I reject their interpretations of the 1947 Law and section 36-14 of the City Charter. The reference to "pension and annuity rights" does not refer to a right to determine how those benefit obligations are fulfilled.

13

interest crediting, variable annuity option, contribution credits for employers, death benefits, credit for legislative service, recognition of income and capital gains and losses in the fixed retirement investment trust and affecting certain actuarial assumption and liabilities under the Wisconsin retirement system." Lightbourn, 243 Wis. 2d 512, ¶39. The court rejected the plaintiffs' argument in Lightbourn that these changes amounted to an unconstitutional taking, explaining that participants in the Wisconsin retirement system have a right to have their benefit commitments fulfilled, but they do not have a "right to determine exactly how employers fulfill their benefit commitments." Lightbourn, 243 Wis. 2d 512, ¶179.

¶88 In Bilda v. Milwaukee County, 2006 WI App 57, 292 Wis. 2d 212, 713 N.W.2d 661, the plaintiffs brought a class action lawsuit against Milwaukee County alleging that changes to the Milwaukee County Ordinances governing the county's retirement system constituted an unconstitutional taking. The challenged ordinance changed the way in which administrative expenses are paid.

¶89 Discussing and applying Lightbourn, the Bilda court of appeals rejected the plaintiffs' challenge, concluding that "the system participants do not have a right to dictate how, within the requirements and limitations imposed by law, the system is administered and funded on a day-to-day or year-to-year basis." Bilda, 292 Wis. 2d 212, ¶14.

¶90 The Unions' claimed right to the size, composition, and manner of election of the members of the Pension Board is

14

akin to asserting the rights the <u>Bilda</u> court rejected, namely the rights to dictate how employers fulfill their benefit commitments and how the system is administered on a day-to-day basis.

¶91 Moreover, the Unions' analyses of statutory and constitutional home rule are misguided. Under a statutory home rule analysis, a four-factor test is used to determine whether a statute preempts a local ordinance. "A municipal ordinance is preempted if (1) the legislature has expressly withdrawn the power of municipalities to act; (2) it logically conflicts with state legislation; (3) it defeats the purpose of state legislation; or (4) it violates the spirit of state legislation." <u>DeRosso Landfill Co. Inc. v. City of Oak Creek</u>, 200 Wis. 2d 642, 651-52, 547 N.W.2d 770 (1996) (footnotes omitted). The instant case does not involve these situations.

¶92 First, the legislature has not expressly withdrawn the power of municipalities to act regarding the 1937 Law. Instead, the 1947 Law granted first class cities like the City of Milwaukee the power to amend the 1937 Law as it applies to the retirement system except that "no such amendment or alteration shall modify the annuities, benefits or other rights of any persons who are members of the system prior to the effective date of such amendment or alteration." As I explained above, the 2013 Milwaukee Charter Amendment does not modify "the annuities, benefits or other rights" of any persons who were members of the Retirement System prior to the effective date of the amendment or alteration.

15

¶93 Second, the 2013 Milwaukee Charter Amendment does not logically conflict with the 1947 Law.[12] The 2013 Milwaukee Charter Amendment does not contradict the directive in the 1947 Law that a municipality may not alter, amend, or modify the annuities, benefits, or other rights of any persons who are members of the system prior to the effective date of the amendment.

¶94 Third, the 2013 Milwaukee Charter Amendment does not defeat the purpose of the 1947 Law. An ordinance may be invalid if it frustrates the purpose of a legislative enactment.[13]

¶95 The purpose of the 1947 Law was to allow cities "the largest measure of self-government with respect to pension annuity and retirement systems" while protecting against an amendment or alteration that modifies the annuities, benefits, or other rights of persons who were members of the retirement system prior to the effective date of an amendment.[14] The 2013

---

[12] See Wisconsin's Envt'l Decade, Inc. v. DNR, 85 Wis. 2d 518, 534-35, 271 N.W.2d 69 (1978) (a city ordinance preventing chemical treatment in Madison lakes logically conflicted with the DNR's statutory power to "supervise chemical treatment of waters").

[13] In Wisconsin's Environmental Decade, Inc. v. Department of Natural Resources, 85 Wis. 2d 518, 535-36, 271 N.W.2d 69 (1978), for example, the court stated that even assuming that the ordinance and statute at issue are not "logically conflicting," the ordinance was nevertheless invalid because it frustrated the state program of water resource management and of vesting authority over the state's navigable waters in the Department of Natural Resources.

[14] See § 31(1), ch. 441, Laws of 1947 (emphasis added):

For the purpose of giving to cities of the first class the largest measure of self-government with respect to
(continued)

16

Milwaukee Charter Amendment is a lawful exercise of the authority granted to first class cities under the 1947 Law, fulfills the purpose of the 1947 Law, and does not make any prohibited amendment, alteration, or modification to members' annuities, benefits, or other rights.

¶96 Fourth and finally, nothing in the 2013 Milwaukee Charter Amendment supports the Unions' argument that changes to the size, composition, and manner of election of the Pension Board violate the spirit of the 1947 Law.[15] Rather, the 2013 Milwaukee Charter Amendment comports with the spirit of the 1947 Law: The 1947 Law allows cities the largest extent of self-government possible while protecting against amendment, alteration, or modification of members' annuities, benefits, or other rights.

---

pension annuity and retirement systems compatible with the constitution and general law, it is hereby declared to be the legislative policy that all future amendments and alterations to this act are matters of local affair and government and shall not be construed as an enactment of statewide concern. Cities of the first class are hereby empowered to amend or alter the provisions of this act in the manner prescribed by section 66.01 of the statutes; provided that no such amendment or alteration shall modify the annuities, benefits or other rights of any persons who are members of the system prior to the effective date of such amendment or alteration.

[15] In Anchor Savings & Loan Ass'n v. Equal Opportunities Commission, 120 Wis. 2d 391, 397-99, 402, 355 N.W.2d 234 (1984), the court concluded that the legislature had "adopted a complex and comprehensive statutory structure" regulating credit and lending, as well as a "complete, all-encompassing plan" regulating savings and loan associations, rendering the Madison ordinance at issue void as "contrary to the spirit" of the legislation.

17

¶97 The Unions' constitutional home rule argument fares no better. The Home Rule Amendment to the Wisconsin Constitution reads: "Cities and villages organized pursuant to state law may determine their local affairs and government, subject only to this constitution and to such enactments of the legislature of statewide concern as with uniformity shall affect every city or every village. The method of such determination shall be prescribed by the legislature." Wis. Const. art. XI, § 3(1).

¶98 The Unions argue that although the legislature declared that any future modifications to the Retirement System would be a matter of local concern, it specifically excepted from that grant of authority the ability to modify rights that had already accrued. However, as I explained above, members of the Retirement System do not have a right in a Pension Board of a particular size, composition, or manner of election.

¶99 Before concluding, I pause to acknowledge the implications of the Unions' asserted right in the instant case. Recognizing the Unions' claimed right to proportional representation on the Pension Board or to a Pension Board of a particular size, composition, and manner of election would limit to a breathtaking extent the City's authority to amend the 1937 Law. If members are vested with the right to a Pension Board of a particular size, composition, and manner of election based upon the date at which the member joined the Retirement System, must the City create new pension boards that administer the Retirement System for different classes of members? If the 2013 Milwaukee Charter Amendment is invalid, is the 1972 amendment,

18

which added the retiree position on the Pension Board, invalid for the same reasons? On what possible basis would adding a seat in 1972 be valid, but adding three seats in 2013 be invalid? Multiple boards of various sizes and compositions administering the Retirement System to numerous classes of Retirement System members would be an unworkable system.

V

¶100 The size, composition, or manner of election of the Pension Board set forth in the 1947 Law and section 36-14 of the City Charter may be amended, altered, or modified. Members of the Retirement System have the right to have their benefit commitments fulfilled, but they do not have a right to determine exactly how those benefit commitments are fulfilled. Thus, I conclude that the 2013 Milwaukee Charter Amendment did not violate the 1947 Law or section 36-14 of the City Charter. The 2013 Milwaukee Charter Amendment did not "modify the annuities, benefits or other rights" of any persons who were members of the Retirement System prior to the effective date of the 2013 Milwaukee Charter Amendment.

* * * *

¶101 For the reasons set forth, I dissent.

¶102 I am authorized to state that Justice ANN WALSH BRADLEY joins this dissent.

19

¶103 DANIEL KELLY, J. *(dissenting).* Well, this is surely curious. Today, the court manufactured and conferred on the employee members of the Employee Retirement System of Milwaukee ("ERS") a right to proportional representation on the ERS Annuity and Pension Board (the "Board"). We also manufactured and conferred on them the right to conduct at-large (as opposed to class-based) elections for their representatives. These rights don't actually exist anywhere in the constitution, statutes, regulations, or common-law, so we had to create them ex nihilo. They may be good and salutary rights for the employee members to have, but this is a question not given to the judiciary to answer. We have no mandate to roam the state looking for good ideas to enact. We exhaust our commission when we pronounce the law as applied to the case before us, and we should be content with that. We were definitely not content with that role today.

¶104 The court found the employee members' right to elect no fewer than 3/8's of the Board's members (after accounting for the retired employees' representative added in 1972), and the right to an undivided franchise, in this distinctly pedestrian language:

> The membership of the board shall consist of the following:
>
> (a) Three members to be appointed by the chairman of the common council or other governing body (subject to the confirmation by such common council or other governing body), for a term of three years,
>
> (b) The city comptroller ex-officio,

1

(c) Three employe members who shall be members of the retirement system and who shall be elected by the members of the retirement system for a term of three years according to such rules and regulations as the board shall adopt to govern such election. . . .

§ 7(2), ch. 396, Laws of 1937 (the "1937 Law").

¶105 If, as the court says, the employees' rights come from this statute, we ought to be able to find them there. This presents a simple matter of statutory construction. Typically, when we set out to discover the meaning of a statute, we start with its language. See State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 ("[S]tatutory interpretation 'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" (citation omitted)).

¶106 Here, however, this method hits an immediate dead-end. The 1937 Law does not say the employees have a right to a minimum percentage of board seats. Nor does it so much as imply the employees have a right to elect their representatives at large, rather than by class. To the extent this statutory provision mentions the employees at all, it simply says the Board will contain three employee representatives, and those representatives will be elected by the employees. Our standard method of statutory construction tells us to stop here and tell the members of the Milwaukee Police Association ("MPA") and members of the Milwaukee Professional Fire Fighters Association ("MPFFA") that the rights they seek are not there.

¶107 But perhaps this is one of those instances in which the claimed statutory rights are not immediately apparent, and

2

fluoresce only in the presence of the violation. The court said the City trespassed on the employees' rights when, in a 2013 city charter amendment ("2013 Amendment"), it added three mayoral appointees to the Board and established voting classes. See majority op., ¶4. With respect to the latter revision, the amendment provides that members of the MPA would vote for one of their own to represent them on the Board, members of the MPFFA would do the same, and the remaining employees would vote for a third representative. See Milw., Wis., Charter Ord. § 36-15-2(a-3)(c).

¶108 So let's compare the results of the 2013 Amendment to the provisions of the 1937 Law. Before the amendment, the employees had three representatives on the Board. After the amendment, the employees had three representatives on the Board.[1] Before the amendment, the employee representatives were "elected by the members of the retirement system." See § 7(2)(c), ch. 396, Laws of 1937. After the amendment, the employee representatives were "elected by the members of the retirement system." See Milw., Wis., Charter Ord. § 36-15-2(a-3)(c). True, they were elected by classes, but each class is composed exclusively of members of the retirement system. Therefore, because no one but a member of the retirement system voted for any of the employee representatives, it is necessarily true that

---

[1] The employees also gained an ally when, in 1972, the City added a representative of retired employees to the Board. Nothing in the 2013 amendment affected that position. See Milw., Wis., Charter Ord. § 36-15-2(d).

they were each "elected by the members of the retirement system." So the alleged violation fluoresces nothing.

¶109 It is, however, entirely understandable that the MPA and the MPFFA would not favor the 2013 Amendment——it reduced the employee members' influence on the board from 3/8's to 3/11's. And voting by class means the MPA and the MPFFA cannot elect more than one of their members to the Board. But the question we are to answer is not whether the 2013 Amendment is good for the MPA or MPFFA; it is whether the City had the authority to enact it.

¶110 The authority to alter the administration of the ERS came from a 1947 statute——the same statute, ironically, that the court says restricts the City's authority to do what it did:

> For the purpose of giving to cities of the first class the largest measure of self-government with respect to pension annuity and retirement systems compatible with the constitution and general law . . . [c]ities of the first class are hereby empowered to amend or alter the provisions of this act in the manner prescribed by section 66.01 of the statutes; provided that no such amendment or alteration shall modify the annuities, benefits or other rights of any persons who are members of the system prior to the effective date of such amendment or alteration.

§ 31(1), ch. 441, Laws of 1947 ("1947 Law"). The legislature decided that the City is to have the "largest measure of self-government," with respect to the ERS, that is "compatible with the constitution and general law."

¶111 To accomplish that purpose, the 1947 Law explicitly and unambiguously authorized "[c]ities of the first class . . . to amend or alter the provisions of this act," which includes the size of the board and the manner of its elections.

4

Id. This broad delegation of authority to the City is subject only to the restriction that, as relevant here, it may not "modify the . . . other rights" of the ERS's members. Consequently, unless the employee members can identify a specific right the 2013 Amendment violated, this statute unquestionably says the City may do what it did.

¶112 The court started its analysis on the weakest possible footing. It acknowledges, as it must, that "other rights" has no statutory definition and that there is no actual language in either the 1937 Law or the 1947 Law that creates the rights it discovers today. See majority op., ¶28. If we followed our standard method of statutory construction, we would have quit the field and informed the MPA and MPFFA that the rights they sought cannot be found in any applicable source of authority. But we didn't quit.

¶113 With no text upon which to rely, we thought to peer behind the legislative curtain in hopes of discovering what rights the legislature meant to confer, but forgot to put in the act they actually adopted. So the court turned to the purpose of the 1947 Law. Majority op., ¶29. Assessing the purpose of a statute can be helpful in discerning its plain meaning, but we refer to the purpose to explain the text, not create substantive rights. "Statutory purpose is important in discerning the plain meaning of a statute." Westmas v. Creekside Tree Serv., Inc., 2018 WI 12, ¶19, 379 Wis. 2d 471, 907 N.W.2d 68 (citing Kalal, 271 Wis. 2d 633, ¶48).

5

¶114 The court fared no better questing after a legislative purpose than it did with finding textual support for its desired result. The best it could do was an observation that the "'purpose of safeguarding the stability of pension systems' was an important concern" for the legislature. Majority op., ¶31 (quoting § 31(2), ch. 441, Laws of 1947). The court quoted only a sentence fragment because the sentence has nothing to do with the court's project. The sentence actually refers to the importance of a pension study committee: "For the further purpose of safeguarding the stability of pension systems in cities of the first class, the governing body shall appoint a pension study commission which shall have jurisdiction over all proposed amendments, alterations and modifications to existing pension, annuity, or retirement systems." See § 31(2), ch. 441, Laws of 1947.

¶115 It's anyone's guess how the importance of a pension study commission relates to proportional voting rights or at-large elections. Nonetheless, the court immediately divined from this that what the legislature was really saying is that "[s]afeguarding ERS stability is promoted by employee-participation in the Board because it is employees, current and past, for whom stability of the ERS is critical. Preamble to ch. 396, Laws of 1937." Majority op., ¶31. It certainly couldn't have found support for that proposition in the Preamble it cited, because the Preamble merely says, in full: "An Act relating to the establishment and administration of retirement systems in cities of the first class for the payment of benefits

6

to the employes of such cities, and to the widows and children of such employes." Preamble to ch. 396, Laws of 1937.[2]

---

[2] Even as legislative analysis, the court errs. It says:

> Employees have the most to gain from a financially stable ERS because the ERS directly impacts their financial security upon retirement. In addition, it is employees who will suffer most if ERS funds are lent to a cause that returns a worthless promissory note in exchange for the funds that the Board manages, as has occurred in other states.

Majority op., ¶32 (footnote omitted).

But this just isn't so. The ERS's financial stability has no effect on the employees' financial security at all. Liability for retirement benefits belongs to the City, and the City must pay them regardless of whether the ERS has any funds to manage:

> [T]he payment of all pensions, annuities, retirement allowances, refunds, and other benefits granted under the provisions of this act and all expenses in connection with the administration and operation of the retirement system are hereby made obligations of the city and city agencies.

§ 27, ch. 441, Laws of 1947. And these obligations are due to the employees as vested contractual rights that cannot be reduced without their consent:

> The annuities and all other benefits in the amounts and upon the terms and conditions and in all other respects as provided in the law under which the system was established as such law is amended and in effect on the effective date of this act shall be obligations of such benefit contract on the part of the city and of the board administering the system and each member and beneficiary having such a benefit contract shall have a vested right to such annuities and other benefits and they shall not be diminished or impaired by subsequent legislation or by any other means without his consent.

§ 30(2)(a), ch. 441, Laws of 1947.

(continued)

7

¶116 Et voilà, the sum total of the law's purpose: A declaration that a pension study commission would be important to the stability of the retirement system, and a Preamble that states the obvious. Somehow, however, the court transmuted this into the right to proportional representation on the Board and at-large elections. And it said its discovery was supported not by some vague musings, but by the legislature's clear purpose: "With that clearly stated purpose in mind, the phrase, 'other rights' easily encompasses employee voting rights because employee members of the Board are in a unique position to oversee the Board's use of funds and thereby safeguard the financial stability of the ERS." Majority op., ¶32. If there is hidden somewhere in there a legislatively-expressed purpose having anything at all to do with voting rights, it is quite obviously not clear. But let's be frank. It's not really there at all.

---

Actually, the people with the most interest in the ERS's financial stability are not the employees, but the taxpayers of the City of Milwaukee, who are ultimately liable for the ERS's financial obligations through the imposition of additional taxes:

> In order to meet the requirements of this act, the common council or other governing body or city agency is authorized to levy a tax annually, which tax shall be in addition to all other taxes such common council or other governing body or city agency has been authorized to levy upon all taxable property, real and personal.

§ 23(b), ch. 441, Laws of 1947.

8

¶117 We are not giving voice to the legislature's purpose. We are defying it. The legislature said, in the text it actually adopted, that the City has the authority to amend the act, the very act that establishes the Board's composition and describes the elections of its members. Upon the City's exercise of its legislatively-granted authority, however, we imposed our will, our veto. Using the catch-all "other rights" provision as a window into the hidden depths of the legislature's very soul, we purportedly saw its "clear purpose" to create and preserve a right to proportional representation and at-large elections, rights so critical to the preservation of the retirement system that the legislature made no mention of them at all. What we should have seen were red flags sprouting up all around us as we privileged judicially-intuited ephemera over the text the people's representatives actually adopted.

¶118 If we were sitting as a legislature, the "purposes" the court attributed to the legislature might be enough to conclude we should grant the employees the voting rights they seek. But as a court, our task is different. We are trying to decide whether the legislature, in fact, did grant those rights. On that question, the court's opinion provides no analysis or information. It ticks off all the prudential reasons the employees ought to have proportionate representation and at-large elections, but it never guides its analysis back to actual legislative text. So the court offers no non-legislative justification for the court's decision.

9

¶119 Neither does the concurring opinion, which is long on general rules of statutory construction, and short——to the point of nonexistence——on sources of law for its conclusion. Its analysis rests on three propositions. The first relates to the author's fear that the City will act recklessly: "[T]he logical extension of the dissents' position would be to allow the City to disband the Employee Retirement System (ERS) Annuity and Pension Board (Board) altogether, thereby eliminating the entire administrative structure of the ERS." Concurrence, ¶1. The second proposition is that what the legislature provides, only the legislature may take away. Specifically, it says allowing the City to change the Board's composition would ignore the "textual requirement of membership consisting of seven members——no more and no less." Id., ¶4. And the third is that we must give the "other rights" provision something to do to save it from surplusage. None of these propositions support the rights the court creates today.

¶120 The concurrence's first proposition is none of our concern. Yes, it is theoretically possible the City would eliminate the Board. But the legislature could do the same thing, and the concurrence knows it. See id., ¶7. Would we tell the legislature the composition of the Board is now frozen for all time because we are worried it might recklessly fiddle with it, or even dispense with it altogether? If not, where do we get the authority to say that to the City? Yes, the City may act imprudently, something cities have always had the authority to do. We have never had a shepherd's crook with which to steer

10

governmental entities away from unwise decisions, and we should not be yearning after one.

¶121 Further, if the City chose to eliminate the Board, why should that be a matter of any interest to us?  The concurrence says this would "leav[e] the ERS without any entity to administer or operate it."  Id., ¶5.  That presumes an awful lot.  Perhaps the City would choose to replace the Board with a managerial staff.  Such an arrangement would still allow the system to operate.  But let's assume the City really does want to sabotage the retirement system, and that it will do so by eliminating the Board and leaving the management space entirely void.  If that decision had the effect of altering or modifying the members' annuities or benefits (by, for instance, making it impossible to collect them), then we would have something to say.  But only because the 1947 Law prohibits the City from altering or modifying the members' annuities or benefits.  See §31(1), ch. 441, Laws of 1947 (providing that no "amendment or alteration shall modify the annuities, benefits or other rights of any persons who are members of the system prior to the effective date of such amendment or alteration.").

¶122 So the concurrence's first proposition expresses not a legal concern, but a distrust in either the City's good faith or its ability to avoid self-destructive decisions.  Either way, this is not a matter for judicial attention.

¶123 The concurrence's second proposition——what the legislature gives, only the legislature may take——proves far, far too much.  It proves so much, in fact, that it contradicts

11

the legislature's express grant of authority to the City. The concurrence says it sees in the 1937 Law a "textual requirement of membership [in the Board] consisting of seven members——no more and no less." Concurrence, ¶4. The legislature didn't say the Board would never be larger or smaller than seven members, of course. It simply specified its composition. But if the concurrence is right about the effect of legislative specifications, then the transfer of authority over the ERS to the City completely failed. Together, the 1937 Law and the 1947 Law specify all of the particulars of the ERS. So if the City cannot change the Board's composition because it was specified by the legislature, then the City may not change any part of the ERS because the entirety of the program was established through legislative specification. That, however, would mean the legislature's directive that "[c]ities of the first class are hereby empowered to amend or alter the provisions of this act," § 31(1), ch. 441, Laws of 1947, has no meaning.

¶124 But the legislature's directive does have meaning. It means what it so obviously says——the City may change any part of the act (all of which are legislative specifications) so long as it does not alter or modify annuities, benefits, or other rights. The concurrence identified nothing about the Board's composition that made it more special than any other specification in the act. And the legislature didn't breathe so much as a word about the members having a right to a Board with an unchanging composition. Therefore, the City may change it as readily as it may change any other legislative specification in

12

the act. And that means the concurrence's central rationale directly contradicts what the legislature actually said.

¶125 Beyond that, the concurrence contradicts itself on this very point. Apparently, under certain circumstances the concurrence does not identify, the City does have the authority to change the composition of the Board. Within two sentences of saying the Board must have seven members ("no more and no less"), it said the court's decision will not affect the City's decision to increase the Board to eight members:

> Justice Abrahamson's dissent questions whether the court's decision in this case means that the 1972 amendment, which added the retiree position to the Board (thereby expanding its membership to eight), is also invalid. That issue is not before us, no one apparently contested the 1972 amendment, and our decision in this case has no impact on that amendment.

Concurrence, ¶4 n.2 (citation omitted).

¶126 If the legislature's specification of the Board's composition means the City may not change it, then increasing the Board's membership to eight was self-evidently beyond the City's authority. If that is not so, then why may the City add one member to the Board, but it cannot add three? Either the concurrence is wrong, or the eighth seat must be removed as well as the three added by the 2013 Amendment. The concurrence cannot have it both ways.

¶127 Finally, there is the third proposition——the concern that we must define the full reach and scope of the "other rights" provision. With respect to this clause, the concurrence said that "when the legislature does not define a term, it is up to the judiciary to identify and declare its meaning, something

13

neither dissent attempts." Id., ¶1. The concurrence fears that, unless we find something to put in the "other rights" category, it might remain forever empty, a provision with no work to do. Our job in this case was not to delve the 1937 Law and the 1947 Law to discover all of the other rights they might confer on the ERS members (if any). The MPA and the MPFFA came to us claiming they had a right to a board of a certain size, and a franchise of a particular composition. Our job was simply to look into the 1937 Law and the 1947 Law to see if those rights were there. If we don't find them, our commission is at an end.

¶128 That doesn't mean the "other rights" provision has no meaning. There might be any number of rights in the 1937 Law or the 1947 Law that this provision protects. But we don't need to know that to resolve this case. We just need to know whether the petitioners' claimed rights exist in those acts. Anything more is a pointless advisory opinion.

¶129 Ultimately, the concurrence is just a petitio principii error, in which it assumed its conclusion as part of its argument. It expressed the error most succinctly when it said that "[w]hile the state legislature precluded the City from changing the composition of the Board, the legislature itself retains this power." Id., ¶7. The first part of the sentence contains the hidden assumption that the "other rights" clause can turn a legislative specification into a right. Because that assumption is the sole motive force for the concurrence's entire argument, the rationale rises or falls with its vitality. But

14

the "other rights" clause cannot accomplish what the concurrence assumes it can. It is not a source of rights, it only protects rights that already exist elsewhere. For it to have any operative effect, therefore, the concurrence must identify an already-existing right that the "other rights" clause can then protect.

¶130 The concurrence did not identify a right to a specific Board size, or a right to at-large elections; all it identified were legislative specifications. Consequently, it identified nothing for the "other rights" clause to protect. In fact, it admitted the rights claimed by the MPA and MPFFA do not exist (apart from the "other rights" clause) when it acknowledged the legislature can change the Board's composition without impacting any of the ERS members' rights. See id. So if the legislature can change the Board without violating a right, why can the City not do the same? Because of the "other rights" provision, the concurrence says. And that completes the petitio principii error. If the members have no right to a specific Board composition as against the legislature, but they do have such a right as against the City, it can only be because the "other rights" clause created a right out of something that was not otherwise a right. How does the clause accomplish such a feat? The concurrence did not say because it simply assumed it could, and it baked that assumption into its conclusion. Classic. We should avoid such illogic.

\*

¶131 Perhaps there is some gnosis to which I have not been initiated that can explain what the court has done here, but I don't see it.  I respectfully dissent.